# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00061-CR

**Donald Smith, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 147TH JUDICIAL DISTRICT
### NO. 006765, HONORABLE WILFORD FLOWERS, JUDGE PRESIDING

## O P I N I O N

An indictment accused appellant Donald Smith and five other men of committing at least three of one hundred eighty-eight enumerated motor-fuel-tax offenses pursuant to one scheme or continuous course of conduct. Tex. Tax Code Ann. ' 153.405(f) (West 2002). The enumerated offenses were: engaging in motor-fuel transactions without the required permit (seventy-eight incidents), failing to make required motor-fuel records (sixty incidents), and falsifying motor-fuel records (fifty incidents). *Id*. ' 153.403(23) (failing to make entry; making false entry), ' 153.403(25) (transaction without permit).[1] After a jury found appellant guilty, the district court assessed punishment, enhanced by a previous felony conviction, at imprisonment for twenty-five years. Appellant now urges that under the court=s charge, the

---

[1] The enumerated offenses were alleged to have occurred between November 1, 1998, and July 31, 1999. Subsequent statutory amendments renumbered the relevant subsections. We cite the current code provisions.

jury did not convict him of an offense. He also contends the evidence is legally and factually insufficient to sustain the guilty verdict. We will overrule these contentions and affirm the conviction.

*Background*

In November 1998, Charles Floyd took over the operation of the Key Truck Stop in Harris County.[2] Appellant=s relationship with Floyd was disputed. Floyd testified that appellant was not his partner and had no ownership interest in the truck stop. The defense introduced in evidence a lease agreement between Floyd and the owners of the truck stop giving Floyd an option to purchase the business; appellant=s name does not appear in this document. However, the State introduced a handwritten document in Floyd=s handwriting indicating that ownership of the truck stop was to be divided equally between Floyd, appellant, and the former owners. Several employees of the truck stop testified that Floyd and appellant were introduced to them as the new owners.

---

[2] The prosecution was brought in Travis County pursuant to the special venue statute governing actions under tax code chapter 153. *See* Tex. Tax Code Ann. ' 153.014 (West 2002).

2

In addition to purchasing industry-standard diesel fuel from permitted suppliers, Floyd purchased diesel fuel pumped from the bottoms of storage tanks being removed from service stations and truck stops as a result of environmental regulations. This waste fuel, which contained various impurities, was mixed with the standard diesel fuel in the Key Truck Stop=s storage tanks and sold to retail customers.[3] Most of the waste fuel was delivered to the Key Truck Stop at night, often after midnight, in a tanker truck driven by Jeff Smith, appellant=s son. Appellant was often present when the deliveries were made. No formal records were kept of these deliveries. In addition, Floyd instructed the truck stop=s accountant to falsify the daily fuel-sales reports by reducing the total gallons sold by an amount roughly corresponding to the amount of waste fuel delivered.

### *Jury Charge*

The district court=s charge authorized a conviction for AEngaging in A Motor Fuels Tax Fraud Scheme@ upon a finding that appellant, acting alone or as a party, committed at least three of the enumerated offenses pursuant to one scheme or continuing course of conduct.[4] Appellant did not object to the charge, but now urges that there is no offense called Aengaging in a motor fuels tax fraud scheme.@ Appellant notes that tax code section 153.403 is entitled ACriminal Offenses@ while section 153.405 is entitled ACriminal Penalties.@ From this, he argues that section 153.405(f) does not create a separate and

---

[3] A sample of the diesel fuel being sold at the truck stop on July 19, 1999, contained twenty percent kerosine, ten percent mineral oil, and two percent gasoline, with the remainder being industry-standard diesel fuel.

[4] The State abandoned several of the enumerated offenses, leaving the jury one hundred seventy-three from which to choose.

distinct criminal offense, but merely provides an enhanced punishment for persons who repeatedly commit an offense under section 153.403. Appellant insists that the section 153.405(f) issue should have been considered at the punishment phase of trial.

Tax code section 153.405(f) provides that A[v]iolations of three or more separate offenses under Sections 153.403(22) through (29) committed *pursuant to one scheme or continuous course of conduct may be considered as one offense* and punished as a felony of the second degree.@ (Emphasis added.) This statute uses language virtually identical to that found in penal code section 31.09, which provides that when a defendant engages in multiple separate thefts A*pursuant to one scheme or continuing course of conduct* . . . the conduct *may be considered as one offense* and the amounts aggregated in determining the grade of the offense.@ Tex. Pen. Code Ann. ' 31.09 (West 1994) (emphasis added). The court of criminal appeals has held that section 31.09 does not merely permit aggregation of individual thefts for the purpose of punishment, but instead creates a separate offense. *See Dickens v. State*, 981 S.W.2d 186, 188 (Tex. Crim. App. 1998); *Graves v. State*, 795 S.W.2d 185, 187 (Tex. Crim. App. 1990); *see also Skillern v. State*, 890 S.W.2d 849, 873 (Tex. App.CAustin 1994, pet. ref=d). We hold that like section 31.09, tax code section 153.405(f), by its terms, creates Aone offense@ that is separate and distinct from the individual offenses defined by section 153.403. The commission of three or more separate offenses under section 154.403(22) through (29) pursuant to one scheme or continuous course of conduct is an element of the offense defined by section 153.405(f), and it was correct to submit this issue to the jury at the guilt stage. Finding no error in the court=s charge and that appellant was convicted of an offense defined by the tax code, we overrule points of error three and four.

*Sufficiency of Evidence*

It is an offense if:

> a distributor, supplier, . . . dealer, . . . or other person required to hold a permit under [chapter 153], or the agent or employee of one of those persons . . . fails to make an entry in the books and records required under this chapter to be made by the person or fails to retain a document as required by this chapter.

Tex. Tax Code ' 153.403(23). Count I(B) of the indictment alleged that appellant, pursuant to one scheme or continuous course of conduct, violated this record-keeping requirement on sixty specified occasions by:

> knowingly or intentionally fail[ing] to make an entry, namely: a record showing the number of motor fuel gallons blended, delivered, purchased, received, or sold, an entry required to be made by the defendant under Texas Motor Fuel Tax Code section 153.219 or section 153.117, while acting as a dealer, or supplier, or as a person required to hold a permit under the Texas Motor Fuels Tax Code.

*See id.* ' ' 153.117 (required gasoline-fuel records), .219 (required diesel-fuel records). At trial, the State abandoned seven of the enumerated violations. Because we find the evidence sufficient to support a finding that appellant was a party to at least three of the remaining violations enumerated in count I(B), we need not discuss the sufficiency of the evidence to support a conviction pursuant to the allegations in count I(A) and (C) of the indictment.

There is no question that Charles Floyd was the operator of the Key Truck Stop during the months in question and, as such, was a motor-fuel dealer under the tax code. *See id.* ' 153.001(4) (defining Adealer@). A diesel-fuel dealer is required to keep a record showing the number of gallons of all

5

diesel fuel purchased or received, showing the name of the seller, and the date of each purchase or receipt. *Id*. ' 153.219(b)(2). In his testimony, Floyd conceded that he did not keep proper records of the waste diesel fuel he purchased for sale at the truck stop. Moreover, the State introduced documents showing that such records as were kept of the waste-fuel transactions did not show the number of gallons purchased or the name of the seller. Thus, the evidence is sufficient to support a finding beyond a reasonable doubt that Floyd was guilty of a continuing course of conduct involving repeated violations of tax code section 153.403(23).

The district court instructed the jury on the law of parties. Under that law, a person is criminally responsible for the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex. Pen. Code Ann. ' 7.02(a)(2) (West 1994). We must determine if the State proved that appellant was a party to Floyd=s record-keeping offenses.

The accountant at the Key Truck Stop, Karen Furst, testified that she was not at work on October 31, 1998. On that date, she received a call from the attendant on duty who told her that two strangers claiming to be the new owners were at the truck stop and asking to Aget into my money.@ Furst immediately drove to the truck stop, where Floyd and appellant introduced themselves. Floyd told Furst,

AWe are taking over the truck stop.@ He later told her that he and appellant were partners. According to Furst, both Floyd and appellant had the combination to the safe at the truck stop.[5]

Louise Gill was employed as a fuel-desk attendant at the Key Truck Stop. She testified that Floyd and appellant were introduced to her at work as the new owners of the truck stop. During this meeting, Floyd stated that Athere was going to be a lot of changes made to the truck stop.@ Appellant, who Gill described as Anot a man of many words,@ nodded and verbally indicated his agreement with what Floyd was saying. Gill testified that after Floyd and appellant took over the truck stop, Jeff Smith would make deliveries of fuel once or twice a week, usually at night. On most occasions, appellant would be with him and would enter the store to get the keys to the fuel-storage tanks. These deliveries were made without the usual cargo manifests and no record was ever made of the number of gallons delivered, although the tanker would usually be weighed on the truck stop=s scales before and after the delivery.

Gill testified that she noticed that the fuel delivered by Jeff Smith and appellant sometimes had an unusual odor. She recounted a particular occasion when a customer complained that the diesel fuel was foaming Alike you had maybe dropped Alka Seltzer in there.@ She called Floyd, who came to the truck stop and took a sample of the fuel. Gill described the fuel as looking like muddy water, with an odd smell. Floyd took the sample to appellant. On another occasion after complaints regarding bad fuel were

---

[5] Furst also testified that she altered the daily fuel-sales reports at Floyd=s direction. The district court instructed the jury that she was an accomplice whose testimony was not to be considered unless corroborated. *See* Tex. Code Crim. Proc. Ann. art. 38.14 (West 1979).

received, Gill overheard Floyd tell appellant over the telephone, AWe have to do something with this fuel. . . . You need to get here now.@ Soon after this call, appellant arrived at the truck stop. He and Floyd had a long conversation, but nothing was done about the bad fuel.

Mona Bynum was another fuel-desk attendant at the Key Truck Stop. She testified that she was hired by Floyd, but was told that appellant was the person to contact if a problem or emergency were to arise when Floyd was absent. Bynum worked the graveyard shift and was often present when Jeff Smith made his late-night fuel deliveries. He was usually alone, but she remembered two occasions when appellant was with him. Bynum recalled several times when appellant called the truck stop to ask if Jeff had arrived to make a fuel drop. Like Gill, Bynum testified that Jeff Smith=s deliveries were made without the usual paperwork.

The evidence shows that Floyd and appellant operated a second truck stop, referred to in the record as Sheldon=s, about five miles from the Key Truck Stop. A Sheldon=s employee, Debra Maknoja, testified that appellant hired her, and that she was told by both appellant and Floyd that the two men were partners. Maknoja and a second clerk at Sheldon=s, Robin Seay, described nighttime fuel deliveries by appellant and Jeff Smith similar to the deliveries they made to the Key Truck Stop described above. Once again, no formal records were kept regarding these deliveries. Seay testified that the first time appellant made a delivery to Sheldon=s was her second night on the job. She said, AHe walked in and it startled me. . . . [T]hen he told me who he was, that he was the co-owner and that he also would sometimes be coming in all through the night, not to be scared.@ She later asked Floyd why she did not receive

8

invoices when appellant and his son made fuel drops. He told her that appellant was a Aco-employee as well as owner in the company and we are handling it.@

Appellant was the self-proclaimed co-owner of both the Key and Sheldon=s truck stops. He and his son routinely made late-night deliveries of waste fuel to these truck stops, for which they had no cargo manifests or invoices and of which no formal records were kept. Appellant=s co-owner, Floyd, supervised the record keeping at the Key Truck Stop, knew that the records regarding the waste fuel deliveries were incomplete, and instructed the accountant to alter the daily fuel-sales reports in an apparent effort to hide the existence of the waste-fuel deliveries. When all the evidence is viewed in the light most favorable to the verdict, the jury could reasonably infer from the circumstances that appellant was a party to Floyd=s scheme and that, by his conduct, he intentionally encouraged and aided the repeated violations of tax code section 153.403(23). *See Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *Griffin v. State*, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (standard of review for legal sufficiency); *see also Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991) (same standard applies in both direct and circumstantial evidence cases). Point of error one is overruled.

Floyd testified that appellant had no ownership interest in or managerial role at the truck stops. Even if this were true, it would not foreclose a finding that appellant was a party to Floyd=s misdeeds. Although it is possible that appellant was unaware of the defective record keeping, it is difficult to reconcile such a possibility with appellant=s role in the unusual midnight waste-fuel deliveries. We conclude that a neutral review of all the evidence does not demonstrate that the proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury=s determination. *See*

**9**

*Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (standard of review for factual sufficiency).

Point of error two is overruled.

The judgment of conviction is affirmed.

_____

Lee Yeakel, Justice

Before Justices Kidd, B. A. Smith and Yeakel

Affirmed

Filed:   March 13, 2003

Publish